IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

POTASH ASSOCIATION OF
NEW MEXICO,

       Plaintiffs,

  vs.                                                                                   No. **CIV 06-1190 MCA/ACT**

UNITED STATES DEPARTMENT
OF THE INTERIOR, INTERIOR
BOARD OF LAND APPEALS, et al.,

       Defendants,

  and

YATES PETROLEUM CORPORATION,
and **POGO PRODUCING COMPANY**,

       Intervenors.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the ***Opening Brief of Potash Association of New Mexico*** [Doc. 32] filed on October 31, 2007, and Intervenor ***Pogo Producing Company's Motion to Strike*** [Doc. 35] filed on January 18, 2008.  Having considered the Administrative Record [Doc. 31], the parties' submissions, the applicable law, and being fully advised in the premises, the Court denies the motion to strike and determines that Plaintiff has not established grounds for treating the Opinion of the Interior Board of Land Appeals (IBLA) [Ex. 1 to Doc. 33-2] as a final agency action or setting it aside under the Administrative Procedure Act (APA).  Accordingly, Plaintiff's *Complaint* [Doc. 1] will be dismissed without prejudice, with the result that the remaining Applications for Permits to

Drill (APD) at issue in this appeal are remanded to the Bureau of Land Management (BLM) for further proceedings pursuant to the IBLA's opinion and the Order of the Administrative Law Judge (ALJ).  [Ex. 3-A to Doc. 37.]

## I.        BACKGROUND

This case arises from a longstanding conflict between oil and gas drilling and potash mining on lands administered by the BLM in southeastern New Mexico.  Such conflicts arise from the fact that, in some instances, one must drill through areas containing potash deposits in order to reach oil and gas deposits located at a greater depth beneath the earth's surface. Oil and gas drilling in these areas may raise safety concerns for potash miners because of questions about whether the oil and gas well casings can leak harmful and explosive substances (such as methane gas) into potash mines.  Oil and gas drilling also may raise economic concerns for the potash industry insofar as some potash deposits in the vicinity of the wells are rendered off limits to mining.

This conflict between oil and gas drillers and potash miners prompted a series of regulatory actions culminating in an order by the Secretary of the Interior published in the Federal Register on October 28, 1986.  See Oil, Gas, and Potash Leasing and Development Within the Designated Potash Area of Eddy and Lea Counties, New Mexico, 51 Fed. Reg. 39,425 (Oct. 28, 1986), corrected, 52 Fed. Reg. 32,171 (Aug. 26, 1987) (hereinafter "1986 Order").  The 1986 Order designates certain sections of land in Eddy and Lea counties as the "Potash Area" and then sets forth a series of ground rules for prospecting, developing, and producing oil, gas, and potash in this area.  Id. at 39,426-27.

Within the Potash Area, the 1986 Order also sets forth a procedure for identifying "potash enclaves" where potash ore is known to exist in sufficient thickness and quality to be mineable under existing technology and economics. Id. at 39,425. With exceptions for "drilling islands" and areas "believed to be barren of commercial ore," the 1986 Order establishes a policy "to deny approval of most applications for permits to drill oil and gas test wells from surface locations within the potash enclaves" described above. Id.

More generally, the 1986 Order sets forth the following four "stipulations" which form conditions to the issuance of a lease for oil and gas drilling in the Potash Area:

> 1. Drilling for oil and gas shall be permitted only in the event that the lessee establishes to the satisfaction of the authorized officer, Bureau of Land Management, that such drilling will not interfere with the mining and recovery of potash deposits, or the interest of the United States will best be served by permitting such drilling.
>
> 2. No wells shall be drilled for oil or gas at a location which, in the opinion of the authorized officer, would result in undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash deposits.
>
> 3. When the authorized officer determines that unitization is necessary for orderly oil and gas development and proper protection of potash deposits, no well shall be drilled for oil or gas except pursuant to a unit plan approved by the authorized officer.
>
> 4. The drilling or the abandonment of any well on said lease shall be done in accordance with applicable oil and gas operating regulations (43 CFR 3160), including such requirements as the authorized officer may prescribe as necessary to prevent the infiltration of oil, gas or water into formations containing potash deposits or into mines or workings being utilized in the extraction of such deposits.
>
> In taking any action under Part A, Items 1, 2, 3 and 4 of this Order, the authorized officer shall take into consideration the applicable rules and

3

regulations of the Oil Conservation Division of the State of New Mexico.

51 Fed. Reg. at 39,425.

Following the issuance of the 1986 Order, Intervenors Yates Petroleum Corporation and Pogo Producing Company (collectively "Intervenors") filed a number of APDs for drilling in the Potash Area, which were subsequently denied by the BLM. Intervenors appealed the denials to the IBLA. Plaintiff Potash Association of New Mexico ("Plaintiff") and a potash mining company, IMC Kalium Carlsbad (IMC), intervened in the administrative proceedings before the IBLA. Pursuant to 43 C.F.R. 4.415 (1994), the IBLA then referred the matter for a hearing before an ALJ on November 18, 1994. See 131 IBLA 230, 1994 WL 741252 (1994).

The IBLA defined the principal issue to be addressed at the hearing as "whether BLM's denial of the APD's accords with the provisions of the 1986 Order." Id. at 235. In particular, the IBLA directed that there be further inquiry on:

> whether the APD's encompass lands within areas qualifying as potash
> enclaves under the parameters established by section 3.III.D.1.c. of the Order,
> i.e., whether the lands are currently unmined areas within Federal potash leases
> where potash ore is known to exist in sufficient thickness and quality to be
> mineable under existing technology and economics, and whether approving the
> APD's would result in undue waste of potash deposits or constitute a hazard
> to or unduly interfere with mining operations being conducted for the
> extraction of potash deposits.

Id. at 235-36 (footnote and quotation marks omitted).

On various dates between August 15, 1996, and March 27, 1997, the ALJ conducted a series of evidentiary hearings on all matters relevant to these issues, which resulted in a

4

transcript over 15,000 pages long.  Over 1200 exhibits were admitted at the hearing, and the BLM submitted an administrative record approximately 10,000 pages in length concerning the 55 appeals affecting 72 APDs that remained pending before the ALJ at the end of the hearing.  The ALJ then issued a 265-page Order dated July 7, 2003, which remanded the BLM's earlier decisions on the remaining set of APDs for further review, without deciding the ultimate question of whether those APDs should be approved or denied.  [Ex. 3-A to Doc. 37.]

The ALJ found that the BLM did not use the proper standard for defining what constitutes a "potash enclave" (or exception thereto) under the 1986 Order.  In some cases, the ALJ also found that the BLM did not cite sufficient evidence to establish the required nexus between a potash enclave and a proposed drilling location.  Such findings made it necessary to remand most of the APDs to the BLM for further review, because the agency needed to reestablish the boundaries of the potash enclaves in order to know whether a particular APD proposed to drill a well within such an enclave.

There remained a smaller set of APDs which the BLM denied based on its application of the stipulations in the 1986 Order.  The ALJ's decision to remand this set of APDs to the BLM for further review was largely based on the ALJ's conclusion that the BLM's application of these stipulations to the remaining APDs was erroneous.  [Ex. 3-A to Doc. 37, at 234-47.]

The parties appealed the ALJ's Order to the IBLA, which accepted additional briefing and issued its own lengthy opinion on September 7, 2006.  See IMC Kalium Carlsbad, Inc.

v. Potash Ass'n of N.M., 170 IBLA 25, 2006 WL 3437153 (2006).  [Ex. 1 to Doc. 33-2.]

The IBLA Opinion covered a number of issues, including the application of the stipulations

in the 1986 Order to the disputed APDs, but ultimately affirmed the ALJ's Order in its

entirety.  The 2006 IBLA Opinion serves as the agency action from which Plaintiff appeals

to this Court.

Although the IBLA was the last to issue its rulings in the administrative proceedings,

Plaintiff names several agencies and officials of the federal government as Defendants in its

appeal before this Court.  All of these Defendants are represented by the United States

Attorney for the District of New Mexico, and for purposes of clarity, the Court refers to them

collectively as "Defendants."

Given their status as lessees whose APDs were initially denied by the BLM during the

first phase of the lengthy administrative proceedings, Intervenors were granted leave to

appear in the proceedings before this Court.  [Doc. 24.]  One of the Intervenors (Pogo) has

filed a motion to strike certain arguments and citations in Plaintiff's briefs which concern

documents that Plaintiff or other potash mining interests  had submitted to the  IBLA during

the additional proceedings that followed the ALJ's Order.  [Doc. 35, 36.]  The documents

referenced in Plaintiff's brief are cited as part of the Administrative Record lodged by

Defendant United States [Doc. 31, AR 032983-032990, AR 034474-034544], but were not

submitted until after the hearing before the ALJ concluded and the administrative appeal

before the IBLA was pending.

## II.    ANALYSIS

Plaintiff seeks judicial review of the IBLA Opinion under the familiar standard articulated in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706.  See Cliffs Synfuel Corp. v. Norton, 291 F.3d 1250, 1257 (10th Cir. 2002).  Under this standard, the Court "will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence."  IMC Kalium Carlsbad, Inc. v. IBLA, 206 F.3d 1003, 1009 (10th Cir. 2000).  The Court does not convene a *de novo* trial or act as an independent factfinder in this context, because "'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  Id. at 1010 n.13 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983)).  To determine the basis for the agency's action, the Court instead reviews the Administrative Record and the briefs submitted in accordance with the Federal Rules of Appellate Procedure.  See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994).

Before reviewing an agency action to determine whether it complies with these standards, the Court must determine whether the APA's jurisdictional prerequisites are satisfied.  The parties have not raised the issue of subject-matter jurisdiction in their briefs or motion papers, and the Court recognizes that a decision by the IBLA (as opposed to a subordinate agency such as the BLM) "shall constitute final agency action and be effective upon the date of issuance, unless the decision itself provides otherwise." 43 C.F.R. § 4.403 (2007); see IMC Kalium Carlsbad, Inc., 206 F.3d at 1009.

Here the IBLA Opinion "provides otherwise" because it affirmed the ALJ's Order, which had the effect of remanding the disputed APDs for further review by the BLM, rather than stating a conclusive yes-or-no answer on whether these APDs should be granted or denied based on the existing record. Under these circumstances, the Court is obliged to raise the issue of jurisdiction *sua sponte*. See Colo. Off-Highway Vehicle Coal. v. U.S. Forest Serv., 357 F.3d 1130, 1133-34 (10th Cir.2004) (noting a court's duty to evaluate jurisdiction *sua sponte*, especially when the exercise of jurisdiction would "usurp the administrative process"); Cotton Petroleum Corp. v. U.S. Dep't of Interior, 870 F.2d 1515, 1521 (10th Cir. 1989) (raising jurisdictional concerns when a litigant sought judicial review of an administrative remand order).

Ordinarily, the decision of an administrative tribunal which has the effect of remanding a matter back to a subordinate agency or division is not considered "final" for purposes of judicial review under Section 704 of the APA, because the matter is still pending before the agency and the parties have not yet suffered a "legal wrong" under Section 702 of the APA. See Fort Berthold Land and Livestock Ass'n v. Anderson, 361 F. Supp. 2d 1045, 1052 (D.N.D. 2005) (citing 5 U.S.C. §§ 702, 704). Similarly, "[a]gency orders which remand to an administrative law judge for further proceedings are not final orders subject to judicial review." American Airlines, Inc. v. Herman, 176 F.3d 283, 289 (5th Cir. 1999); accord Exxon Chemicals Am. v. Chao, 298 F.3d 464, 466-67 (5th Cir. 2002).

This rule is consistent with the approach taken by the Tenth Circuit when a party seeks to appeal a district court's ruling that remanded a matter back to an administrative

tribunal, thereby giving the parties a second chance to prevail at the administrative level.

See, e.g., Garner v. U.S. West Disability Plan, 506 F.3d 957, 959-60 (10th Cir. 2007); cf.

Olenhouse, 42 F.3d at 1579-80 (directing district courts to review administrative actions by

analogy to the rules of an appellate court); Herman, 176 F.3d at 288 (collecting cases in

which courts have analogized the APA's requirement of "final agency action" to the "final

decision" requirement of 28 U.S.C. § 1291).  "In the administrative context, a remand order

is 'generally considered a nonfinal decision . . . not subject to immediate review in the court

of appeals.'"  Rekstad v. First Bank System, Inc., 238 F.3d 1259, 1262 (10th Cir. 2001)

(quoting Baca-Prieto v. Guigni, 95 F.3d 1006, 1008 (10th Cir. 1996)).

Courts have recognized exceptions to this general rule when an administrative remand

order has "practical finality" or when exhaustion of administrative remedies would be futile

and is not required by statute.  See id. (collecting cases that apply the practical finality rule);

Anderson, 361 F. Supp. 2d at 1051 (noting circumstances in which exhaustion of

administrative remedies is not required).  Thus, courts must still review administrative

remand orders on a case-by-case basis to determine whether they fall under such exceptions.

See Garner, 361 F.3d at 1051.

In this case, it is not disputed that the terms of the IBLA's Opinion and the ALJ's

Order require the APDs at issue in this appeal to be remanded to the BLM for further

proceedings before a final decision is reached on whether to grant or deny them.  And while

Plaintiff phrases its arguments in terms of the standards for setting aside a final agency action

under Section 706 of the APA, under this procedural posture such arguments also may be

construed as asserting that the IBLA Opinion has practical finality, or that further attempts

to exhaust administrative remedies would be futile, because the challenged language in that

Opinion sets forth standards or procedures for the agency to follow on remand that are so

onerous as to amount to a *de facto* determination that all the APDs must be approved.  As

such, the parties' arguments on the merits of the IBLA Opinion are intertwined with the

Court's jurisdictional inquiry.

In particular, Plaintiff's appeal to this Court focuses on whether the IBLA acted

arbitrarily and capriciously (and effectively precluded Plaintiff from obtaining any

meaningful relief on remand) when it interpreted the 1986 Order to mean that:

> Collectively considering the first, second, and fourth oil and gas lease
> stipulations, we conclude that APDs may be denied if BLM determines that
> contamination will occur (i.e., infiltration caused by oil and gas drilling cannot
> be prevented) and then determines that the physical presence of this
> contamination will interfere with potash mining, result in undue potash waste,
> or constitute a hazard to potash mining.

IMC Kalium Carlsbad, Inc., 170 IBLA at 52.  According to Plaintiff, this interpretation

erroneously alters both the burden of proof and the standard of proof for determining an

APD's compliance with the stipulations in the 1986 Order, thereby precluding the BLM from

denying an APD unless Plaintiff or the BLM conclusively demonstrates that hydrocarbons

emanating from an oil or gas well have leaked into a potash mine or otherwise caused an

accident.  [Doc. 32.]

The Defendants and Intervenors do not read the quoted language from the IBLA

Opinion so narrowly.  According to these parties, the IBLA's iteration of the grounds on

which "APDs may be denied" under the 1986 Order was not meant to be exclusive, because it does not state that "APDs may be denied *only* if" all the conditions set forth in the language quoted above are met. They cite other portions of the IBLA Opinion, as well as the ALJ Order, which suggest that there remain other grounds for denying an APD without placing an onerous and unwarranted evidentiary burden on Plaintiff or the BLM. [Doc. 33, 34.]

For purposes of determining the practical finality of the IBLA Opinion and the futility of further administrative proceedings, I agree with the Defendants and Intervenors that Plaintiff's strained interpretation must be rejected because it employs the fallacy of diversion, also known as the "straw man" fallacy. See Edward Damer, Attacking Faulty Reasoning 157 (3d ed. 1995). Under this fallacy, Plaintiff takes certain language from the IBLA Opinion out of context and distorts its meaning so as to give it practical finality and make it inconsistent with the plain language of the 1986 Order. Having distorted the meaning of the IBLA Opinion in this manner, Plaintiff then proceeds to show that such a distorted meaning would preclude it from obtaining any meaningful relief on remand and instead produce a result that is arbitrary, capricious, unsupported by substantial evidence, and not in accordance with the law set forth in the 1986 Order.

When the challenged language in the IBLA Opinion is placed in its proper context, however, I conclude that there is no basis for treating it as a final agency action under Section 704 of the APA or setting it aside under Section 706 of the APA at this juncture. Both the IBLA Opinion and the ALJ's Order consistently reject the parties' efforts to solicit blanket rulings that would effectively require the BLM to issue the same decision on all APDs in the

Potash Area regardless of the circumstances.  For example, the IBLA Opinion states that:

> The terms used in the potash, oil, and gas lease stipulations evince qualified (not absolute) rights that are predicated upon findings of "undue interference with orderly development and production" or "unduly interfere with mining operations." These BLM findings are inherently fact, issue, and case-specific, suggesting that there is no clearly unresolvable conflict between oil and gas drilling and potash mining or exploration in the Potash Area.

IMC Kalium Carlsbad, Inc., 170 IBLA at 54.  [Ex. 1 to Doc. 33-2.]  Similarly, the ALJ's Order notes that the second stipulation "requires BLM to determine whether a proposed well will 'constitute a hazard to' a specific mining operation rather than calling upon BLM to make a categorical judgment about the safety of drilling oil and gas wells within the Potash Area."  [Ex. 3-A to Doc. 37, at 194.]

The last section of the ALJ's Order addresses the BLM's reasons for denying each APD in greater detail.  [Ex. 3-A to  Doc. 37, at 234-47.]  With respect to the APDs for Pogo's Federal 23 well numbers 4 and 6 through 16 and Yates's Martha well numbers 7 through 9 and its Dolores well number 4, the BLM concluded that the wells "have the potential to make the mining of potash unsafe and ultimately uneconomic, therefore constituting undue waste of potash."  [YP 80 at RP 001050; YP 81 at RP 009615.]  With respect to the APDs for the Belco number 5 well, the Yates's Anise Well, and the Yates' Okerlund well numbers 1 through 4, the BLM denied the applications because "[d]rilling at the proposed location would likely interfere with potash mining and result in undue waste of known enclaves reserves.  It could also prove hazardous to the health and safety of potash miners."  [YP 43a, RP 004398; YP 42a; RP 004361; YP 45a, RP 004518; YP 46a, RP

004567; YP 47a, RP 004622; YP 48a, RP 004669.]

> The ALJ's Order noted that the latter statements

> are adapted from the first and second oil and gas lease stipulations. As analyzed in this decision, the "interfere" provision of the first stipulation and the "undue waste" portion of the second stipulation pertain to potash deposits, while the "unduly interfere" and "hazard" provisions in the second stipulation concern "mining operations being conducted for the extraction of potash deposits." Although there are mine workings within a few miles of the well sites, mining operations were not being conducted at the time the decisions were issued and the reason BLM believed that the wells would affect mining operations is not apparent.

[Ex. 3-A to Doc. 37, at 242-43.] Thus, the ALJ rejected the BLM's reasoning because it

conflated the stipulations pertaining to "potash deposits" with those pertaining to "mining

operations," and because the evidence cited by the BLM did not support its findings.

The ALJ's Order also rejected the BLM's reasoning because it introduced new terms

which did not appear in any of the relevant stipulations:

> [T]he first oil and gas lease stipulation places the burden on the applicant to establish that drilling 'will not interfere with the mining and recovery of potash deposits" while the second stipulation allows BLM to deny and APD which would "unduly interfere" with ongoing mining operations. The State Director's decisions are unclear as to which provision was being applied, but neither is satisfied by a determination that drilling would "likely" interfere with potash mining. Nor is a finding that drilling is "likely" to result in undue waste sufficient under the second stipulation. Similarly, the statement that drilling "could . . . prove hazardous" fails to address the standard of the second stipulation which requires a finding that a well would "constitute a hazard" to mining operations. Moreover, the decisions do not provide any indication of the reasons the facts noted in the decision rationales support application of the provisions of the stipulations.

[Ex. 3-A to Doc. 37, at 245; see also id. at 236.] The IBLA Opinion reiterates these concerns

about the BLM phrasing its decisions in terms of "potential" and "likelihood" without

13

adequate citation to evidence in the record to quantify or substantiate the risks involved, or

to explain why these risks cannot be prevented by the requirements prescribed under the

fourth stipulation.  See IMC Kalium Carlsbad,, Inc., 170 IBLA at 51-52.

By rejecting the BLM's reasoning in this manner, it does not follow that the IBLA

Opinion shifted the burden of proof and imposed a new standard which requires the BLM

to allow oil and gas drilling in the Potash Area unless its opponents can demonstrate with

absolute certainty that the drilling will in fact contaminate a potash mine.  On the contrary,

the burden of proving the conditions stated in the first stipulation remains on the applicant,

and all the stipulations may involve predictions about future events which involve a degree

of uncertainty and entail an assessment of risks.  For example, the term "hazard," as used in

the second stipulation, refers to the BLM's "opinion" about "a thing or condition that *might*

operate against success or safety" or "a *possible* source of peril, danger, duress, or difficulty."

2 Webster's Third New International Dictionary of the English Language Unabridged 1041

(1981) (emphasis added).

But, as the ALJ's Order points out, this portion of the second stipulation does not refer

to oil or gas drilling which would constitute a hazard to any potential potash mining that

could conceivably occur in the future.  Rather, the language at issue is phrased in the present

tense so as to focus the hazard inquiry on "mining operations being conducted for the

extraction of potash deposits," 51 Fed. Reg. at 39425, which the ALJ's Order construed as

"mining operations underway at the time an APD is reviewed."  [Ex. 3-A to Doc. 37, at 194.]

Under this interpretation, the stipulations in the 1986 Order do not allow the BLM to pile

inference upon inference so as to base its decision-making on a *possible* source of peril, danger, duress, or difficulty to a *possible* future activity directed at extracting a *possible* potash deposit which *might* be discovered in the future.

There are other portions of the first and second stipulations which are not limited to assessing the risks that oil and gas drilling pose to the mining of potash deposits.  These provisions also may entail balancing such risks against other considerations in order to determine what degree of interference or waste is "undue," or how "the interest of the United States will best be served."  Id.  On this point, the ALJ's Order reflects a concern that the BLM was not balancing the risks and benefits of drilling in a case-specific manner and was instead premising its decisions on a blanket determination that all interference or waste is "undue," or that the best interests of the United States could never be served by oil and gas drilling in the Potash Area.

The end result of the IBLA Opinion affirming the ALJ's Order is simply to remand the APDs back to the BLM to make case-specific and fact-specific decisions on each application in a manner that accords with the plain language of the 1986 Order.  Plaintiff's arguments supply the Court with no lawful basis for setting aside this result or attributing practical finality to the IBLA's rulings.  Such finality is lacking because the parties may avail themselves of a meaningful opportunity to pursue further administrative remedies on remand. Accordingly, this action will be dismissed without prejudice.

The Court's conclusions in this regard do not depend on whether the arguments or documents referenced in Pogo's Motion to Strike [Doc. 35] are considered as part of the

record in this appeal.  It is not the Court's role at this juncture to reweigh the evidence in

light of the Van Sambeek report or to decide whether the policy choices reflected in the

agency's approach to regulating the Wyoming trona beds are better than those reflected in

the regulations for the Potash Area.  See IMC Kalium Carlsbad, Inc., 206 F.3d at 1011-12.

The appropriate response to Plaintiff's use of these materials is not to strike them from the

record but simply to conclude that they provide no basis for setting aside the IBLA Opinion

or attributing practical finality the rulings stated therein.

## III.    CONCLUSION

For the foregoing reasons, Pogo's Motion to Strike is denied and the Court determines

that there is no basis for treating the IBLA Opinion as a final agency action or setting it aside

at this juncture. The effect of the Court's ruling is to allow the remaining APDs at issue in

this appeal to be remanded to the BLM for further proceedings as directed in the IBLA

Opinion and the ALJ's Order.

**IT IS THEREFORE ORDERED** that *Pogo Producing Company's Motion to Strike*

[Doc. 35] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's *Complaint* [Doc. No. 1] is

**DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED** this 29th day of August, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge